This is a hearing requested by Mr. Olano to respond to the order to show cause why Mr. Olano violated the court's rules and orders that set out in the January 22, 2018, order to show cause. I understand that you are represented by counsel. Counsel, make an appearance, please. Yes, I cannot allow the clerk to participate in any order to show cause. All right. And Mr. Burke, would you mind coming up to the lectern? All right. Although it's a small, intimate and wonderful courtroom, the acoustics are not great here, so we have microphones so that we'll be able to pick up the proceedings. And we are recording the proceedings today, so if it should be necessary to have any record that can be made available, it will be appearing on the court's website. All right. So you've received the order to show cause, you've submitted a response, you've submitted a pre-hearing statement, and I've studied those. And I'm interested in hearing more from Mr. Olano, and I will ask a question for him, and I wanted to know how you are intending to proceed today. I think perhaps Mr. Olano might be uncomfortable of bringing Mr. Olano to the stand and sharing his question. The question that I would ask him would be very redundant. All right. That sounds—that's fine. Do you intend to make any kind of an opening or closing statement? I think I would say that the opening or closing statement is very well encapsulated in the conclusive remarks of the pre-hearing statement. Mr. Olano recognizes that we still have all the world's sports talent. Mr. Olano, I'm going to give you the choice of either sitting there and talking in the microphone or talking at the lectern, whichever you would prefer. You sit there. That's the witness seat, and you're welcome to sit there. Yes, that's fine. Sir, the question is on the cards. Okay. Why don't you— And put your stuff down, but before you sit down, I'm going to have the courtroom deputy administer the oath. Please have a seat. Mr. Olano, do you want to make any preliminary statements, or do you want me to just begin with my questions? No, Your Honor. Go ahead. All right. So, looking at the record of your practice before the court, there was a time before you started working with Ms. Vargas, Ms. Patricia Vargas. And I'm wondering if you could describe in what ways your practice was different before you started working with Ms. Vargas. Okay. Basically, what happened was, on or about July 2014, Ms. Vargas passed away. I believe it was like Fourth of July weekend. I worked with her a lot. I did a lot of her appearances. I did a lot of her master calendars and merits in EOIR court. I even argued for her orally in the Ninth Circuit one time in Pasadena because she spent a lot of her time in Chicago. She passed away in July 2014. I took over her practice. She did a lot of Ninth Circuit. She helped me, mentored me especially, in learning how to do Ninth Circuit and BIA appeals. Okay. Let me go back and just fill in a few things. I'll get back to this area. Let's talk a little bit about your educational background. Yes. Where did you attend college? My undergraduate was University of Southern California, Bachelor of Arts 1996, BA History. And I got my J.D. Rutgers, University of Camden, class of 2002, Your Honor. Okay. Let's just fill in a little bit. After 2002, did you sit for a bar exam that year? I took the California bar exam once. I didn't pass. I took the California bar exam the second time I passed. What year was that? 2003, February. I got the results June or May 2003. I didn't get sworn in until June 6, 2003. Then I sat for the Nevada bar and I passed. I don't recall the exact date of the Nevada bar, but I got sworn in in September of 2003. I don't recall the exact date. So you've been admitted to practice in California and Nevada since 2003. That's correct, Your Honor. So what was your first employment after you passed the bar exam? I worked for a tax defense firm, Capital Tax Services in Willow Hills, California. But I was only there for a few months. I was laid off. And then I went to work as a solo practitioner doing criminal immigration law, Your Honor. Because I had trouble finding a job. It was like a recession at the time. What year was this? 2004? No, no. It was about September of 2003. I only worked a couple months at Capital Tax Services. I looked for a job, but in the meantime, I would get family members. People asked, especially, like, you know, I come from an immigrant background. Both my parents are Salvadoran immigrants. I would get people from, like, my church or people to ask me, Hey, do you do immigration law? Do you do criminal law? My cousin's been locked up in L.A. County Jail. I just dove into it. I mean, I did put my resume out there for law firms, but it wasn't successful. So that's how I plowed into it. So, and how long did you continue with your criminal immigration practice as a solo? How long have I been doing it? I've been doing it since 2003, Your Honor. Oh, I see. So that's, you consider yourself a criminal immigration practitioner? Yes. Okay, getting back to where we were, now that we've filled in the background. So our court records don't reflect the kind of issues that were laid out in the order to show cause before, I guess, you were more actively involved with Ms. Vargas. So I'm trying to take us back to a time before then, and to see whether your practice was different then than it was after you became more active with Ms. Vargas. Yes, I took over practice in 2014. She had like 200 clients that expanded my client base. I took, I retained her staff. And I realize now that, you know, I should have put in a better calendaring system. And that's... But you didn't, I guess the court didn't notice that you experienced the kind of problems before 2014, or, let me see, not before, but earlier on, before. So I guess what I'm searching for here is you've described in your response here  not good practices. Correct. But I'm wondering, was there a time before you adopted those practices on a scale that you were following a different set of schedules, ability to comply with court rules, before you were, you bought into Ms. Vargas' approach? Well, it was similar. I mean, I would use, like, my Google calendaring. I would just use Microsoft Outlook. And I didn't respond to all, like, the motions like the OSC said. And in retrospect, I should have immersed myself in that. Did you have the same kind of... Have you always had this practice when you had a case in the Ninth Circuit of this sort of split billing agreement with your clients that you'd charge one amount for the petitioner review, another amount if they wanted to go forward with the briefing, et cetera? Was that always your practice? Usually, I don't... I adopted her billing practices. I didn't have that because the Ninth Circuit cases that I had, I would bill differently. I would take, like, payments, but I would, like, just do a flat fee. You would have been in a lot better shape if you had continued to do that. If that's correct, yes. So what was your typical engagement letter like when these... in the cases that are mentioned in the order to show cause where there were issues with cases being dismissed because fees weren't paid? In the case where the fees would be paid and then a brief wasn't filed, the case would be dismissed. What was the typical client engagement letter or agreement for those cases? The typical retainer and engagement letter was we would do the petition for review. We would require a second payment of... The petition for review cost $500, right? No, we charged $1,500. You charged $1,500. $500 of it was to pay the fee. The filing fee and the other $1,000 was to prepare the petition? The brief, yes. Okay. I'm sorry. I apologize. My understanding is you charged a certain amount. The $1,500 was just to file the petition for review. That's correct, Your Honor. Okay. So then, according to what I understand from your statement, that $1,500, you collected that money, you were done. Unless they paid you more money, you weren't doing anything more. Am I correct? No, Your Honor. It would be we would continue on and we would require another payment for the brief, but our retainer would say that if we didn't receive payment, we would withdraw. All right. I don't see many instances where you actually withdrew. That's correct, Your Honor. I should have been more diligent about withdrawing. And so how much did you charge for the brief, preparing the brief? It would be a payment of, let me get the retainer. It would be another payment of $500 monthly. $500 monthly? Yes. For a total amount of how much? $4,500, Your Honor. All right. So how much would a client have to pay for you to actually file a brief? Well, we filed briefs sometimes. We lost contact with them. We filed briefs anyway. So we weren't, in retrospect, I should have done motions to withdraw, and some of them I lost contact with. So there wasn't a set amount. We would lose contact, and then. Okay. So how did it work here? You filed a petition for review. Yes. Eventually you paid the fee, as you know. Yes. The court is very concerned about the amount of time it took and the amount of court resources it took to issue order after order, asking you when you're going to pay. You have to pay. You have to pay. But in some of these cases, you paid the fee, and the court set a briefing schedule. So the brief would be due 60 or 90 days after that date. So here you have a case. It's in the court. You've paid the fee. You've got a brief due date. So what would be the next step with the client? What communication would there be with the client at that stage? We would send out letters, or we'd mostly use the phone calls. Sometimes we lost contact with them because many times they would just disappear on us. They would pay the initial retainer, and then they'd just disappear. Okay. Were there instances where you had a client that didn't disappear? Yes, there were several, yes. They didn't all disappear, right? That's correct. So when you had a client that didn't disappear, and you knew the brief was due in another 45 days, let's say, what would you do? Did you say you'd send them a letter? Yes, mostly for a phone call. I would call them, or my secretary would call them. Okay. So then they'd say, okay. Did they sometimes pay? Yes, sometimes they would pay, yes. And then did you file briefs in a timely manner on those cases? Some of those briefs I didn't file timely, Your Honor. And then I would do the motions to reinstate. So when a client paid and fulfilled their side of the bargain, why didn't you file the brief? I got overwhelmed by the calendaring of it. And you just let the brief due date go and then wait for the court to issue an order dismissing it? I shouldn't have done that, but that's what happened, Your Honor. I mean, that's... Are you aware that you could file a motion for an extension of time to file a brief? Yes, Your Honor. For now, I do realize that after speaking with counsel and getting more up to speed on the regs. So how... I know you inherited a bunch of clients from Patricia Vargas, but how do you now get new clients? Most of them are word of mouth. Most of them I do from the beginning of the pipeline, which is it would come in. There would be, like, removal proceedings. I would be the one doing the merits at the EOIR level. And then if that would get denied, most of them would be, like, from the BIA and then the Ninth Circuit, Your Honor. So what percentage of your appeals in the Ninth Circuit are cases that you actually handled below, at the BIA or at the immigration judge? I would say about 80%. 80%? Yes. Because I noticed on a number of these cases, the attorney below is a fellow named Carlos Barrios? Yes. Is he somebody with whom you're affiliated? Because it looks like a lot of the cases that you've had are cases where he was representing the client in the administrative law. Yes. He would refer me to those cases. Are you sure that that was only 20% of your cases or would it have been more than that? I don't want... That you've done a list? I am making an estimate to the best of my knowledge. I don't want to overstate it, but I don't want to understate it. Do you think the 80% figure is pretty accurate? The 80% of the cases that you litigated in this court are cases that you counseled below? I haven't counted all the Carlos Barrios cases in the OSC or litigated, but I would say... And then looking at the car over the weekend, getting prepared for this hearing, I did notice that there were some Carlos Barrios cases in there that he litigated below. Okay, so let's go back to the filing fee. Yes. Let's say you paid the filing fee, case is going forward, then the government files a dispositive motion. Motion for summary disposition, motion to dismiss. What... How does that sort of fit into your fee structure where you've said, pay me this to file the petition, pay me another amount for the brief. What about these dispositive motions? What would you ask of your clients then? Well, sometimes we would call them, but then we would respond to them. Because most of them were like, they want to do a summary affirmance. And we should have responded to them. Have you ever responded to a government motion for summary affirmance? Or a motion to dismiss by the government in that stage? I think I responded... I'm talking about an initial response and not a response after the case is dismissed. They make a motion. As a lawyer, you have an obligation either to oppose the motion, or if you don't oppose the motion, run the risk that the court will grant it is unopposed. Does that make sense? That's right. Are you understanding what a lawyer would do in that circumstance? Yes, Your Honor. So I don't see any case ever, not even one, where you file an opposition to a government motion to dismiss. The only time I ever see you filing a motion in response is after the case gets dismissed, where you file a motion for rehearing. Am I correct, or do you have some examples of cases where you actually opposed a motion? I don't have any examples, Your Honor. Do you think it's accurate to say that you never have opposed a motion? To my recollection, I don't think I've responded to one of those motions, but I have improved. I've gotten some of those motions now, and after I spoke with counsel, I got the OAC, and now we're responding to them right away. Well, you understand that if you don't, you do run the risk that the court will grant it is unopposed. And then, if you thereafter want to oppose it, you have a very high threshold to meet, because you've already defaulted on your response. So now you have a petition for a hearing where you have to show, you have a much higher show-off, why the court was wrong in granting this unopposed motion. Now, not only do you have to oppose on the basis that you could have opposed earlier, but you have to also explain why you didn't oppose and why the court should at this stage change its disposition when you didn't timely oppose it. That's correct, Your Honor. Okay. So I'm trying to give you a sense of how your practice appears to the court. Yes, Your Honor. So this is a big red flag when you fail to respond to a motion, and then you file a petition for a hearing. Which you've done a few times. Yes, Your Honor, and I do acknowledge that, and I spoke with counsel after I got this, and he pointed me to the regs, and I've made corrective measures on that, and we're now responding to those motions in a timely manner. Do you have any examples of a response to a motion that you've done recently? Yes. If I may? Yeah. But it's not in the OSC. Excuse me? It's not in the OSC, Your Honor. Yeah, no, that's fine. I assume it's more recent, then, because you've changed your practice. Correct. So I'm thinking maybe this would be a good subject for a post-hearing submission, rather than having you go through your records. Now, why don't I ask counsel, within seven days after, by next week, next Tuesday, to submit a post-hearing submission identifying cases in which you filed an opposition to a dispositive motion. Yes, sir. And I want to also include any opposition in order to show cause issued by the court why a petition for review should not be dismissed from our jurisdiction. I don't know if there have been any, or if you've responded to any of those, but I would be interested in hearing about that as well. Yes, sir. So, from what I gather from our discussion here today, is that most of the cases where you filed the filing fee and that were ready to go were cases where a brief action was not filed at the time of the matter. Yes, sir. And then, sometimes later on, you would file a brief with a petition from the state. In what circumstances would you decide to file a brief after the main case has been dismissed from elective prosecution? Well, we did it. We would try to do it. I would try to do it. In all the cases, I missed a date, and I would try to remedy what I did wrong. Well, but you've already told us that you didn't file a brief at all if the client hadn't paid the money, right? Correct. So if the client paid the money, you're obligated to file a brief, right? Whether the client paid the money but you didn't file a brief. It was regardless of whether the client paid the money. We would get in contact with the client. We would ask him if he wanted us to continue the case. And many times, I filed a brief without him paying. That was a condition at all, Your Honor. That's not my understanding from what your response is to the order that shook us. I thought you described a payment schedule that you adopted from Ms. Vargas where you would charge her $1,500 at the outset, file a petition for review, allow you the authorization to withdraw if further payment were made. So if further payment were made, presumably under this understanding, the case would get dismissed if they didn't pay you any more money. Isn't that the way the… Sometimes we would do the case because I wanted to avoid harm to the client. So we would do the brief. And sometimes I didn't file. Sometimes I had trouble doing the brief because I would get the car and I realized that some of the issues weren't there. It would be like there was no social group there or there was a firm resettlement issue or the record wasn't developed enough. And I would try to contact the client. I would lose contact with the client. Mostly to do the brief it was getting contact with the client. But you would need to collect the money, yes, according to your agreement? Yes, but in practice it was like getting contact with the client, making sure they want to go forward. I did a lot of free work too. So you make… What about the brief due date? Where does the brief due date fit in with your practice? If the brief due date is 30 days away, you get in touch with the client and the client says, okay, yes. Do you file the brief on time or do you wait for the case to get dismissed and then file a motion against it? No, no. Most of the times, especially now, we file a brief on time or I ask for extension. Sure. And what about during the cases that were the subject of this order to show cause? Some of them I let go because of bad calendaring, which I've changed. But I was diligent in a lot of the other cases because, I mean, the day I got referred on November 15th, I was in the Ninth Circuit on oral argument. So, I mean, I have been trying to be as diligent as possible with the Ninth Circuit. I haven't been. I sought out counsel. I haven't made changes, Your Honor. In a lot of these cases, we have done a lot of free work. I've done a lot of free work trying to remedy and avoid harm to the client, even if they didn't pay money. And because we didn't withdraw, that's when I did motions to reinstate in a lot of these cases. Well, my understanding is that at least some, if not most, of the motions to reinstate types of cases were precipitated by a change in the status quo vis-à-vis your client as they were issued in order of imminent removal. So then, you may not have wanted to pay the money for you to file the brief, but now that they're facing this deadline of getting removed, then they get back in touch with you and say, Oops, I'm about to get removed. Can you help me? Yes, Your Honor. And that's when you file a motion of petition to reinstate, right? That happened in this year's trial in the U.K., but some of them I filed a motion. I should have filed a motion to dismiss in some of these cases where one gentleman got put in proceedings under credible fear. That was Bonda. And then on another, Daron Arias, we did a motion to reopen with the BIA. He's now reopened and in front of immigration court. Okay. So here's one point. If the BIA grants a motion to reopen, do you know what the consequence is with the pending petition for review in our court? Yes, Your Honor. What? I should have done a motion to dismiss as moot. Exactly, because it divests our court of jurisdiction. Once it's back, there's no more effective order of removal, so our court no longer has jurisdiction to hear the petition for review. So in the event that you are successful in the motion to reopen, congratulations to you and please file a motion to dismiss the petition because we won't necessarily know that that's occurred, but we'll keep monitoring this case in the court. And there's a lot of people here, not enough people, just a lot of people who are overworked trying to deal with a huge volume of cases. And when we have additional work that these folks have to do because attorneys aren't diligent, that's what leads to these orders that should cause. I understand, Your Honor. And after I spoke with Mr. Burke, I do realize that that's what I should have done. Now I know that in this case I should have filed a motion to dismiss. So when you file a motion to reinstate under the time pressure that we talked about, which has happened from time to time, the motion to reinstate has to be accompanied by, if it's a dismissal, if you fail to file a brief, the motion to reinstate must have a brief with. And you've done that, you've submitted briefs. Yes, Your Honor. With the motion to reinstate. Yes, Your Honor. Do you think that those briefs that you've submitted under that kind of time pressure are as workmanlike and good as other briefs that you've done that have more time? The briefs do reference the law. Some of them, that's why I didn't do the briefs, because I tried to make them as workmanlike as possible. I didn't want to put any, what's the word? I didn't want to do an inadequate brief. Or sometimes I'd find a car and, like, the issue just wasn't there. I didn't want to do a frivolous brief. Sometimes you did briefs just to reopen the case? No, no, no. That wasn't my intention at all. The brief was not as a dilatory tactic. The brief was actually an argued law that was supported by evidence in the record. There was no dilatory tactic or anything. So, as you sit here today, do you think it's important for you to notify the court if you file a motion to reopen that's granted? I do realize the expense that the court has and also the jurisdictional aspect. I have spoken with Mr. Burke. I do know that I should have filed a motion to dismiss, and from now on, when we do a motion to reopen or we get from the BIA, it is my practice now to file a motion to dismiss. Let's say a briefing schedule is coming up. You try to communicate with your client. You can't find your client. Yes, and I do. So what now is your practice? We will either move to withdraw or just do the brief. We have no, we can't do any harm to the client, or if the client is not cooperating with us, do a motion to withdraw. That's the correct answer, to remove any doubt. Okay. And if the client decides not to proceed with the appeal, do you also think it's appropriate then for you to move to voluntarily dismiss the petition for review? Yes, Your Honor. Yes, the clients sometimes do tell me that they don't want to proceed, especially in the light of the law. Well, that's one of the cases, Magdaleno. He didn't want to proceed. So in 2015, in October, the court issued an order in a case called Duran-Arias. Yes, Your Honor. You know about that case. You mentioned it in the order to issue a clause. Yes, Your Honor. This is a case that criticized you for your practice with respect to timely paying the final fees. Yes, Your Honor. How did you react to that order? Okay. Let me get my notes on that, and then I'm going to pull up the ADR. And what did you change, if anything? Okay. As a result of that case, the change came later after the OSC. But this is a case where we filed a motion to reopen the BIA. It got reopened. Excuse me for a second. The OSC was more than two years late. Oh, yeah. I'm talking about back in 2015 when you put on notice about the burden that failure to timely pay the fines in places on the court. Yes. You know what I'm talking about, right? Yes, Your Honor. That's my order in the Duran-Arena case. So in that case, there was a dismissal for failure to pay the fine fee, and then a motion to reinstate. Because you failed to calendar the deadline for paying the fee. This one. Which, in at least five other petitions for review, were similarly dismissed. And this order involved a third motion to reinstate after such a dismissal. And it said, this pattern of delay burdens the court's limited resources. I warn that your future failure to comply with the court's orders may result in the imposition of sanctions. So this is in October of 2015. You put on notice that the practice of failing to pay fees in a timely manner was burdened the court's limited resources. So what did you do in response to that order two years before the earlier show cause issue? My recollection, I didn't make those changes at the time, Your Honor. I showed up, and now I have. All right. So what are you doing now about paying filing fees? I'm asking for them up front. I'm telling the client, you know, you pay the initial fee for our fees, plus what the court charges. $500 up front. I sent the Ninth Circuit. So are you waiting for the court to issue a docketing letter now, or are you paying it? No, Your Honor. Sorry. We're sending the check right away, like two, three days later, when we get a docket number. Okay. So in response to the OSC, you talked about the initial 14-day extension to pay the fee. So I'm unaware of any automatic extension to pay the fee. I know that when we receive a petition for review, the court issues a docketing letter that says fees due. Where is it? But the expectation, as you just stated, is your new practice, that you pay the fee. You don't have to wait to be reminded about your obligation to pay the fee. It's an obligation that you have in conjunction with filing a petition for review. Yes, and I spoke to counsel about that. I've been noticing the OSCs one or two days after I filed the PFR. But we send a check right away, like the same week. Have you ever asked for an extension of time to pay a filing fee? I know we've filed informed propers. I don't know that I have. I don't recall. It seems like if the problem was getting in touch with the client, if the client said, I don't have the money now, but I'll have it in another week, that that would be inappropriate. I don't think it would be inappropriate to file a motion for an extension of time. Yes, Your Honor. In light of what the court has said, but I changed my practice now to just, I don't even want to ask the court for an extension of time on paying the fee. I just tell the client, before we take any new cases, you have to pay, if you want to retain my office, I tell the client, you have to pay the fee, no ifs, ands, and buts. All right. So you talked a little bit about your calendaring practice changing. And I want you to describe what steps you've taken and in what way your steps have led to a system that you feel confident will address the issues identified in the order to show cause about paying filing fees, filing briefs, keeping up with what the court expects of you as a lawyer in terms of the court's deadlines for the various tasks that affect the petition for review. Okay. I purchased a new calendaring software called Practice Panther, and I placed all my calendaring there. Excuse me, for Ninth Circuit and everything else on there. And I'm going through training to them right now using all the features, the tickle system. So now you can look up, you have all the resources right now to identify the cases that are pending and when all their due dates are. Yes, sir. All right. So do you know how many briefs you have due in the next few weeks at the Ninth Circuit? I believe we have two. But they'll check it. I have to go online. Is that possible to do now? Not right now. I don't have the signal. All right. I think it's more than two. I think deadlines are coming up pretty quickly on these briefs, so I expect you to pay careful attention to those due dates and either submit briefs in a timely manner or move in a timely manner for an extension of time to follow those briefs. And do you know when a motion is due for an extension of time to follow a brief? I believe it's 14 days. Seven. So seven days before the due date. And what about your engagement letter that contracted your clients? It described what your practice was with Ms. Vargas. Well, I docked in her practice, which I think was flawed and led to a lot of the problems that we had. So now when you have a client that is interested in pursuing their petition for review at the Ninth Circuit, what is your agreement? It's a flat fee, plus we collect the filing fee, and we're going to do the whole work. And if we lose contact with them, if they don't cooperate with us, we will move to withdraw. But now that's how I changed the… And what does that fee cover, the flat fee? The entire case up to the… It includes filing the petition for review? Petition for review and the brief. Filing the dispositive motions or official costs? Yes. Motions for extension of time, et cetera? Everything. Filing the brief? Period or oral argument if it's scheduled? Yes. Because after consulting with ethical CLEs and also with my counsel, I just decided to junk that old system and just do a flat fee and just include everything in the contract and not worry about that. And counsel has informed me of the process how to do a proper motion to withdraw. Well, from the court's perspective, when an attorney makes an appearance and is representing a client, the court expects the attorney to represent the client through the entirety of the case's history at the court. The court doesn't know that an attorney and a client have an agreement that says we do up to this point and then do it in terms of my filings. I think this is an appropriate step that you've taken. And I think it's the way an attorney should operate at the court. And I think that the system that Ms. Vargas had is not good for an attorney. And what you had was not the way an attorney should practice before this court. I understand, Your Honor. And I've changed that. And also, I have taken cases all the way. In many cases in the Ninth Circuit, I've done oral arguments three times in front of the Ninth Circuit. I didn't charge the client additionally. I did an oral argument in Seattle. The only thing extra I asked for the client was extra money for airfare. And that was Tamaka's case about three years ago. I took that all the way to the oral argument with Reinhart before he passed away. And then I did an oral argument November 15th in Pasadena. So I have taken a lot of these cases to the conclusion. And I didn't withdraw. And many times I did work without remuneration. And so now what is your fee for your clients to do a full service appeal? $6,000, Your Honor. Yes, I've changed that. It would have been removed. All right. Okay. All right. Let me move now from all the sort of process and procedural questions to some of the questions that the auditor show clause raised concerning the substance of your briefing. So I think one thing that the auditor show clause talked about, and I want to make sure that you get this message, is the concern that your briefs typically have failed to cite much testimony or record evidence in developing the argument. I'm not necessarily talking about the statement of facts. This is what happened. What I'm referring to now is how you have used the legal theories that you've identified in the context of the particular case. So are you following me right now? I'm following you, Your Honor. I didn't want to cut your train of thought. Do you think that does this sound, does this seem plausible to you? Do you understand this concern, or do you think it's warranted? I have spoken with counsel on this, and some of it is difficult because the record sometimes is sparse, and the difficulty is finding like a particular social group, especially on these asylum cases. Okay, let me go through one more case that may be helpful in identifying it. Here's a copy of briefs in Elias, Delgadillo, and Valterra. Counsel, I'm giving copies of briefs to Mr. O'Meara. This is 9th Circuit document number 1771694. This is a petition for review. The petitioner is Elias, Delgadillo, and Valterra. And it's a case concerning asylum and other forms of relief, and holding, and cat relief. So just flipping through the brief, I think that there's an adequate statement of the case. It's described procedurally what occurred, the jurisdiction, and I do note that there are references to the administrative record. Those are in the statement of the case, and there's an adequate discussion of jurisdiction and the standard of review. Then let me go to the argument section. So the argument section talks about, I guess the main issue in this case was whether there was an adequate particular social group. So there's a lot of discussion here, and there's statements of what the law is, what the real IDX is, what the criteria are for eligibility for asylum, what a well-founded fear means, what factors you have to show. All of this is fine and well. There's only one sentence in the entire argument here that actually talks about, well, there's one key sentence. If you look at page six, it's talking about fear of persecution. The very bottom sentence, there's all this. And then here's the argument that you're making about how to apply all this law to this case. It says, Petitioner claimed the records of future persecution as a returning Mexican national accompanied or visited by his minor United States citizen children, who will become targets of indiscriminate and widespread violence at the hands of the drug cartels and associated criminal elements who the Mexican government is unable or unwilling to control. So first of all, there's no citation there to the record, which there should be. And then there's no real further development of that. When you said with the wireless, you've kind of argued, you've kind of identified, okay, here's this group, but you need more. There's more needing. Why does the law apply to this group? Why should this group be given the treatment that you want it to be given? How does this group fit into all this law? It's just not enough to just say, here's the legal theory, here's what I say. You have to then develop it more. You have to articulate it more. There was a case, I think, where you might have been co-counsel. Let's see. There's a case called Pineda de Rodriguez, where a Rania family gets co-counsel with you. Do you know that case? Let me check. It's 16-73389. Do you know, I hope I'm pronouncing your name right, Tanya Pham? Attorney? Tanya who? Pham, P-H-A-M. No, no. Maybe I'm mistaken. Okay, maybe I got my facts wrong. But the principle remains the same about this. Now, I can talk to you about the concept of developing your case by applying the law to the facts. Here, you haven't really applied the law to the facts. You've stated what the law is. You've stated what the fact is. But we're missing that argument, why these facts satisfy the legal criteria. Do you understand what I'm saying? Yes, I understand. Making sense in context, though, is what I'm hoping for. Yes, John, I do realize that in, I guess, Iraq, I should bore A in the C. I mean, if you're not getting it, I'd rather have you tell me. I really want to make sure that this is something that it's a skill, an art skill, that it's important for lawyers to develop this, to be effective appellate litigators. Now, it's not something that you're born with. It's something that you can learn, and you can learn it and develop it. And there are some ways that you can accelerate that development. One way that I'm going to recommend that you consider, assuming that you consider practicing in the court, is to take advantage of the court's mentoring program. Do you know about that, that the court has such a program? You can locate it on our website, www.ca9.uscourts.gov. If you look at the attorney section on that page, you can see that the court has a mentoring program. The mentoring program is comprised of attorneys who are experienced, skilled attorneys who have offered to volunteer their services to assist other attorneys in becoming more proficient practitioners at the court. So you can get an attorney to take a look at your brief and give you some ideas. And one of those attorneys would, in the context of a particular case, be able to give you feedback on your writing that would demonstrate this point for you. And maybe that would be a very good way to proceed. And I would recommend that you do that. Yes, Your Honor, Mr. Burke has recommended me some CLEs. I have looked for some Ninth Circuit CLEs. I couldn't find them. It was scheduled recently. I would have taken them. Right. So that's another. That was the second thing. There are programs, both in immigration practice and in appellate practice, that can give you, I think, helpful guidance on effective brief writing. I realize a lot of the clients that you represent are in predicaments where they have little likelihood of success, given the state of the law, and your obligation as a counsel is to zealously represent them. And you kind of have to walk this tightrope between your ethical obligation of zealous representation of your client and your obligation as an officer of the court not to file frivolous filings. And that's a difficult challenge, I think, for immigration practitioners. But it's one you can do. And if you have these tools to use your best thinking and express it persuasively in your briefs, I think you can accomplish that and discharge your ethical responsibilities, both to your clients and to the court. Yes, Your Honor. But I will definitely look into the mentoring program. I did attempt to look for a Ninth Circuit writing CLE, which Mr. Burke recommended to me. I couldn't find any of the providers. But I did take some CLEs on office management already. Okay. Well, that's a key, but this is a separate and different issue that needs to be addressed. Yes, Your Honor. Of course. So, for example, one thing I talked about was the way in which you communicate, this ability to do it. But one other thing that the order to show cause talked about was your legal analysis, just a basic understanding of what's appropriate to argue at the court of appeals. And that is, and I think we touched upon this briefly, and this is the question of the particular social group. That's correct, Your Honor. So we noted in the order to show cause that, in some instances, there was a particular social group that was articulated and identified at the BIA. And then in your brief here, you articulated a different particular social group. Now, do you understand why you can't do that? Yes, Your Honor. And why is that? Well, now especially in EOIR, the judges are now making us write a particular social group statement. Why can't you write a different social group at the Ninth Circuit than you raised at the BIA in the immigration court? It wouldn't be, that's not what was raised at the record. It has to be argued. It has to be exhausted. It has to be exhausted at the agency level and at the BIA level. So sometimes your particular social group is more persuasive than the one that was argued below. Correct, Your Honor. I can't argue with you if it wasn't raised below. I mean, I suppose at that stage, if you were to look at a case like that, if you were the attorney below, you know, slap yourself. But if you're taking over a case for somebody else, then I suppose you can move to reopen saying counsel didn't identify the appropriate particular social group. It really isn't this one. Yes. I should have done a motion for you, Your Honor. That would have been more appropriate to the court. Do you have anything else you want to tell me at this stage? I'm done with my detailed questions. Is there any kind of statement you want to make or anything else that you want to make sure I understand before we're done with the hearing? No, Your Honor. I think we've been, I mean, I've made the changes and I enjoy immigration law. So I like to help people and I like to help, especially like in my family and my social group. Do you think you've been a competent practitioner before in this court? Let me pose that question slightly differently. Do you think from the court's perspective, from the court's perspective, that you've been a competent practitioner before in this court? I don't want to minimize the behavior that led to the OSC and I realize my errors, but to the best of my ability, I have tried to litigate these cases, Your Honor. And I have taken steps to remedy the deficiencies in these cases. I don't want to minimize that at all. Okay, so we'll take a look at what's happened since you were released from prison. This is January 22nd. So, since then, there were three cases that were dismissed for failure to prosecute. The first case was a case called Cisneros, Gil Cisneros. The case was fully briefed. It was dismissed on January 31st after you failed to respond to the court's third request that you submit paper copies. Can you explain what a case like Cisneros is? What do you mean by paper copies? That was a calendar error on my part and I have to double check, but I think we did submit the briefs. No, you don't have, you don't have, have you searched, because I think there's an attorney, there's a way to get a signal in here. Have you searched for a link for a wireless connection? No. Why don't you do so? All right. All right. You're not getting it? No. Okay, so this is what I want you to add to that post-hearing submission. One of the detailed description of why the case was dismissed. Okay. 16-73663, Cisneros v. Sessions. What's frustrating about this, it was fully briefed, ready to be submitted to a panel for decision, but it wasn't because you failed to submit to three requests for paper copies. You know you have to file paper copies for the briefs. Yes, sir. The second one was dismissed only a couple of weeks ago, a case called Lozano Fuerte v. Sessions, and that was dismissed because no opening brief was filed. Yes, the brief is, I'll work on it right on your end. Did you file a motion? You didn't file a motion for extension? You didn't file a motion to reinstate? I didn't file a motion to reinstate, but I'm filing a brief. You didn't file a motion to reinstate because you don't have a brief. Right. And that was April 25th. Yes, sir. Okay, so you just told me a moment ago that you changed your practice. I just thought... And now we have a case where a brief was dismissed. The case was dismissed for failing to file an opening brief, which I thought means total failure. Yes, Your Honor, I just got behind on filing that brief. I'm writing it right now. I'm going to do a motion to reinstate. Okay, so if you could go back in time to a month ago... I should have filed a motion to extend the briefing. Then in the case called Noe Sandoval, this is another fee matter. So the petition was dismissed on March 16th. You pay the fee six days later, but not until the case is dismissed. How did that happen under your new system of taking care of matters? I did send in the fee. Yeah, and then the case was dismissed six days later. So I thought then you knew after the election president that this was going to happen. Yes, and I took...  I submitted the fee, Your Honor. So how do I know this is going to happen next week? What's going to change? I just bought the practice tender software recently, and I'm getting all that. There's also a pending motion to dismiss in another case, 18-70307. In the fee case? In the fee case. Oh, yeah, yeah, yeah. I'm sorry. In that case, there's a motion to dismiss. In the case you paid. Are you aware of that? Yes, Your Honor. And do you intend to comply with that proposition? Yes, Your Honor. I'll comply with the proposition. So... I thought I understood you to say that your practice was now to pay the fee at the time, but this case was dismissed for failure. Is that because this happened before you got... Why? Tell me, why was it said, dismissed for failure to pay the fee, when I thought your practice now was to pay the fee in advance? I'm not sure, Your Honor. I think I might have been delayed. I'm not... I don't think... Your response to 18-70187, description of why... why the fee was not paid in a timely manner, why the case was dismissed, and what steps can be taken in order to avoid this from happening again. Um... And then get back to Luazano Puerte, the description of why the case was dismissed, if they have found nothing aggrieving. Uh-huh.  It's... It's... It's... Okay, that's all. I secure that I am now informed that there was no motion to dismiss in that particular case. It was a different case. You don't need to... In the Sandoval case, there is no motion to dismiss in Luazano Puerte. It was a separate case. There is a pending motion to dismiss. But I do want you to explain why the fee was not timely paid in Sandoval. Yes, Your Honor. Why and why it took a dismissal to get the fee paid, which is what got you here in the first place. Yes, Your Honor. Right. Anything further, Mr. Berk, that you wish to raise? I'm sorry, Rosal, anything further that you wish to raise or talk about before we end this hearing? No, Your Honor. Mr. Berk, anything further? Can you come up to the, uh, lectern, please? Thank you, Your Honor. Uh, we, uh, when did you, uh, when did you contract the practice pamphlet? That's what the motion is. Let me double check. I'm finding it, I think it's one of the exhibits. Oh, okay. But, uh, even if possible... I want to say about two weeks ago. And, uh, we, uh, when did you and I, uh, first start talking about the practice management system? Okay. Um, right after the OSU, when we were doing the response, I looked into it. I looked into abacus law. I met with a representative of Smokeball, which is another software company. Um, finally I got to get, I just made a decision to pull the trigger on. Practice Panther due to your recommendation and also the, the, the fees involved. And, uh, with any of these softwares that you look at, um, what is the, what have they, or what have you learned in terms of the training and implementation time to get those things operating fully? The, uh, the, it takes time. You have to input the thing, and they're very integrated with other software. So you need several hours of training. And when are you having your training, uh, well, let, let me not presume anything. Have you received any training from, um, Practice Panther, which is the one you've gone with, yet? Not yet. I, I have to reschedule it. Okay, and when is that scheduled for? Um, I have to, I have to call the rep. Okay. And, uh, overall, how many different packages did you look at or speak to representatives from for Practice Panther before deciding? I looked at five or six. I looked at the, the finalists for Smokeball and Practice Panther. I looked at abacus law. I didn't like the features. There was one that was suited only for immigration, but that was more for, like, forms and EOIR, so I didn't choose to take that one. Even though it was cheaper, but since this is more an appellate issue and calendaring, I, the better one was Practice Panther. Okay. So you haven't, but you haven't had the training or been fully implemented yet? That's correct. And when did you say you have the training scheduled? I haven't made an appointment yet with the rep. The rep is in Florida, so I have to call him to, to get, make a date that he's available and I'm available too. And did he indicate how much time he needs to spend with you to get that? About two hours. Um, but you've already got the system, you've got your calendars set up. Yes. You've been doing lots of videos. Yes, I've been watching, that's what I've been doing. I've been watching videos that he sends me a link through email. I've watched about three videos so far, about half my reach. Why do you think that that's going to affect things in your practice? Because Practice Panther is the software that integrates Microsoft Word documents with the calendaring, so it's going to improve the production as well as the calendaring, so I don't miss anything. I'm going to stop the recording for the instructions, so I'm going to have my question in there. When you do a brief at the Ninth Circuit, does anybody help you? Um, yes, I do get some help. So how does the brief production process work? Who does the initial drafting, etc.? One of my staff members, but then I take over, I do, and I do most of it. Like a paralegal who does the first shot? Yes. Especially with these cases with a particular social group in asylum, they're difficult cases. So after the hearing, you're going to wait a week to get your supplemental submission. Then I'm going to prepare an important recommendation about what I think is the proper disposition here. You'll receive a copy of that, and you'll have an opportunity to file any comments or objections. And then the brief, along with any submission that you want to make, is going to be sent to a panel. And they will make the final decision on whether and to what extent it should be physically imposed. Understand that? Yes, sir. Any questions? No, no. Any further comments or statements? All right. This matter will then be submitted pending the receipt of the post-hearing submission. And then the preparation will be put on the table. Thank you.
judges: Appellate Commissioner Shaw